<u>AFFIDAVIT OF DEA SUPERVISORY SPECIAL AGENT ROBERT BARRETT
IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>

I, Robert Barrett, being duly sworn, depose and state as follows:

**Introduction and Agent Background**

1.  I make this affidavit in support of an application for a search warrant to require Verizon Wireless, a provider of wireless telephone service located at 180 Washington Valley Road, Bedminster, NJ 07921, which functions as an electronic communications service provider for its users, to provide records, contents of messages, and other information pertaining to the customer or subscriber whose account is associated with the wireless telephone number 508-247-7586, which was used by Chelsea Joslin (hereinafter "the Joslin Telephone"). As set forth herein, there is probable cause to believe that on the systems of Verizon Wireless and in relation to the account set forth above, there exists evidence of violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

2.  I have been a Special Agent with the Drug Enforcement Administration since 1996. On or about March 1, 2009, I was promoted from Special Agent to the position of Supervisory Special Agent and reassigned to the Cape Cod Task Force, Barnstable, Massachusetts, of the New England Field Division. Prior to my assignment to the New England Field Division, I had been assigned as a Special Agent to the Organized Crime Drug Enforcement Strike Force in New York City from late 2002 to March 2009. Before my assignment to the New York Field Division, I had been assigned to the Miami Field Division, where I worked on the Mobile Enforcement Team in Miami and then an enforcement group in West Palm Beach from 1996 to 2002. Prior to joining the DEA, I was employed by the United States Marshals Service in the District of Vermont as an Intermittent Deputy U.S. Marshal from 1992 to 1996. I have a Bachelor of Arts degree in Criminal Justice from Norwich University the Military College of Vermont. During my employment with

1

the DEA, I have participated in numerous investigations relating to the illegal distribution of controlled substances, including heroin, cocaine, marijuana, and methamphetamine. My duties in these and other investigations have included monitoring wiretapped conversations, executing search warrants, executing arrest warrants, and conducting physical surveillance, among other investigative methods. Those investigations have resulted in arrests and convictions for violations of the drug laws, seizures of drugs and firearms, and forfeitures of money and motor vehicles. I have received training in the field of narcotics enforcement, investigations, and apprehension of narcotics offenders from the DEA Basic Academy in Quantico, Virginia.

3. Through my education, training and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. Specifically, I am aware that drug traffickers commonly use cellular telephones in furtherance of their activities. I am also familiar with the manner in which narcotics traffickers use coded language or slang, and more specifically the use of text messages as a means of communication. I am also familiar with the common appearance, packaging, texture and smell of various narcotics, including heroin, cocaine, crack cocaine, and marijuana.

4. Through my training and experience, I have also learned that Verizon Wireless is a company that provides wireless telephone and data services to the general public. Among the services commonly offered to wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging." Based on my knowledge and

2

experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission.

5.      With this affidavit and application for a search warrant, I am seeking authorization to search the accounts and files described in Attachment A, by means of the procedures also outlined therein.

**Background Regarding Wireless Communications Services**

6.      I have had both training and experience in the investigation of crimes involving the use of wireless communications services. Based on my training, experience, and knowledge, I know the following:

   a. Wireless communication service providers, such as Verizon Wireless, facilitate wire and electronic communications among wireless communication devices. Such devices are most often mobile telephone devices ("mobile phones"), but they can include wireless networking cards that interoperate with personal computers and similar devices. Such communications can include both voice communications and data services.

   b. Wireless communication devices can be identified in a number of ways. One way is by reference to the current telephone number assigned to that device by the wireless provider. Because wireless providers can change the telephone number assigned to the same wireless device, such devices may also be identified by other identification numbers including the International Mobile Equipment Identity ("IMEI"), the Mobile Equipment Identifier ("MEID"), or the Electronic Serial Number ("ESN") assigned to the device. They may also be identified by the International Mobile Subscriber Identity ("IMSI") associated with the device.

   c. Among the services provided by most wireless communication service providers are SMS and MMS, which provide the ability to send discrete data messages from wireless device to wireless device through one or more wireless providers. These can range from short text messages to small audio, video, and image files.

   d. Typically, these SMS and MMS messages are addressed to a wireless communication device using the telephone number currently assigned to that device. Wireless communication service providers then cooperatively route the messages to the intended addressee for delivery to that device.

3

e. Mobile phones and similar devices may not be continuously communicating with the wireless provider's network, as they may be turned off or in a place where service is unavailable. Accordingly, SMS and MMS messaging is provided on a "store and forward" basis. Under this model, the recipient's wireless provider receives the SMS or MMS message intended for its subscriber and stores it temporarily until it can be delivered to the recipient's mobile phone or other wireless device when it again is accessible to the network.

f. Even after delivery of the SMS or MMS message to the customer, the wireless communications provider may choose to preserve a copy of the message and transactional records associated with the message for billing, backup, or record purposes. Providers may keep such records of such messages, including the date, time, sender, recipient, and/or content of the message, for a number of days or weeks after they have been sent or received by the wireless customer.

g. SMS and MMS messages can be and are used by criminals to transmit relevant information about their criminal activities, including information relating to times and places of meetings, information and records relating to their criminal activities, and other communications to facilitate criminal activity.

h. Wireless providers also generally retain records of their subscribers' address, banking, or credit information and usage information in order to facilitate billing for usage of the account. This information can be useful for identifying individuals using the wireless communications device.

**Stored Wire and Electronic Communication Access**

7. The government may obtain the contents of a wire or electronic communication, such as text messages, and customer information from an electronic communication service provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

8. Any court with jurisdiction over the offense under investigation may issue a §2703 search warrant, regardless of the location of the electronic communication service provider whose information will be searched. 18 U.S.C.§§ 2703(a), 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

9. If the government obtains a search warrant, there is no requirement that the provider

4

give notice to the customer. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

**Sources of Information Contained Herein**

10. I have personal knowledge of many of the facts and circumstances related herein as a result of my investigative efforts. I have also been assisted in this investigation by officers from the Brewster Police Department and the Massachusetts State Police, among others. Since this affidavit is being submitted for the limited purpose of seeking authorization for the issuance of a search warrant, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts and circumstances that I believe are necessary to demonstrate probable cause for the warrant to issue.

**Probable Cause**

11. On July 31, 2009, at approximately 12:45 p.m., Leslie Kelley called 911 to report that she had discovered her daughter, Chelsea Joslin, unconscious in a bedroom in their house at 1334 Main Street, Brewster. Brewster Paramedic Kurt Riker arrived at the house and pronounced Ms. Joslin dead at approximately 1:00 p.m. Massachusetts State Police Trooper Daralyn Heywood was notified of the death at approximately 1:30, and she arrived on the scene shortly thereafter. She observed Ms. Joslin lying on her right side on the floor of her bedroom. Right next to Ms. Joslin, and adjacent to the bed, she observed an uncapped needle attached to a syringe on a small foot stool. On top of a bureau in the same bedroom was a small ziplock baggie containing off-white residue material consistent with the appearance of heroin. Next to the baggie was a metal spoon, the ladle end of which contained a ball of tissue or cotton. Next to the spoon, she observed a prescription bottle filled with water. Based on my training and experience, I believe that this combination of

5


materials is consistent with heroin use. Trooper Heywood seized the above-mentioned evidence and subsequently turned it over to the DEA for analysis.

12.  Other evidence developed during this investigation suggests that Ms. Joslin was a drug user. Her mother, Ms. Kelley, told Trooper Heywood that Ms. Joslin had a heroin problem. In addition, officers of the State Drug Task Force have informed me that an undercover Harwich Police officer purchased heroin from Ms. Joslin in September 2007 and that she was known to Task Force Officers as a narcotics user and distributor.

13.  Given the narcotics paraphernalia found in Ms. Joslin's bedroom, as well as her history of drug use and distribution, it seems likely that a heroin overdose contributed to her death, though further tests are pending.

14.  The requested warrant seeks text messages that will help illuminate the circumstances that led to Ms. Joslin's death. First, the text messages could reveal Ms. Joslin's whereabouts in the hours before her death. For instance, Trooper Heywood interviewed Tom Joslin, brother of the deceased. Mr. Joslin stated that he received a text message from the Joslin Telephone on July 30, 2009, at approximately 11:30 p.m., advising that Ms. Joslin was at the Brewster/Orleans line and asking him for a ride home. Mr. Joslin stated that he texted back: "Where are you?" According to Mr. Joslin, Ms. Joslin replied approximately 15 minutes later with a text message indicating that she had found a ride and would see him the next day. These text messages between Ms. Joslin and her brother provide evidence of her whereabouts within hours of her death; access to more such messages would provide additional detail.[1]

---

[1]The messages that the Joslin Telephone received from Mr. Joslin cannot be accessed through the device itself, perhaps because Ms. Joslin deleted them upon receipt. Accordingly, neither I nor any other agents working on this investigation have been able to review the messages. As

15.     Second, and more important, there is reason to believe that Ms. Joslin used the texting function on her telephone to communicate with narcotics traffickers. For instance, I have reviewed a text message that the Joslin Telephone received on July 31, 2009, at approximately 1:30 p.m. – shortly after Ms. Joslin was pronounced dead. The message, which was sent from telephone number 508-237-5011, reads: "Hey its dave. You like that stuff? U need more?"

16.     Several hours later, the Joslin Telephone received a voice-mail message from the same telephone number, 508-237-5011. The message was left by a female at approximately 6:22 p.m. I have reviewed this voice-mail message, and following is a transcription:

> Hey Chelsea, it's Kathleen. I heard you met, um, my boyfriend last night, Josh, with a David Geoffrion and, um, he gave me your number today and I was just calling to see how you were doing and, um, how your family is and, um, if you needed anything. I (laughter) . . . give me a call back, um, you don't have to go through Dave if you don't want to. You can just, can just come to me (laughter), 508-237-5011. All right, I'll talk to you soon, hun. Bye.

17.     On the basis of subsequent investigation, I believe that "Kathleen" is Kathleen Lofstrom, DOB 8/7/1984, and "Josh" is Joshua Johnson, DOB 12/13/1986.

18.     On the basis of this evidence, I believe it is highly probable that the text messages sought pursuant to the requested warrant will reveal evidence of criminal narcotics activity. For instance, on the basis of my training and experience, as well as my investigation in this case, I believe the text message from "dave" about "that stuff" is likely a reference to narcotics distributed to Ms. Joslin shortly before her death. Similarly, "Kathleen" left a voice-mail indicating that Ms. Joslin had been with an individual named David Geoffrion the previous night. This could well be the "dave" who texted Ms. Joslin about the "stuff." In addition, "Kathleen" asked if Ms. Joslin

---

described in ¶6(f), above, it is possible that Verizon Wireless has preserved these and other messages.

"needed anything," adding that "you don't have to go through Dave if you don't want to." On the basis of my training and experience, as well as my investigation in this case, I believe it is likely that "Kathleen" was discussing narcotics trafficking.

19. Since Ms. Joslin may well have died as the direct result of a heroin overdose, text messages that provide further evidence of her narcotics purchases may shed light on the manner and cause of her death.

**Conclusion**

20. Based upon the information above, there is probable cause to believe that on the computer systems owned, maintained, and/or operated by Verizon Wireless, with an address of 180 Washington Valley Road, Bedminster, NJ 07921, there exists evidence of violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. By this affidavit and application, I request that the Court issue a search warrant directed to Verizon Wireless allowing agents to seize the communications and related information stored on the servers of Verizon Wireless for the accounts and files described in Attachment A, by means of the procedures also outlined therein accounts. The warrant will be faxed to Verizon Wireless personnel, who will be directed to produce those account records and communications in the company's possession. The information requested should be readily accessible to Verizon Wireless by computer search, and its production should not prove to be burdensome.

**Request for Sealing**

21.     Since this investigation is ongoing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will seriously jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of the application for a search warrant, the application for a search warrant, and all attachments thereto be filed under seal until further order of this Court.

ROBERT BARRETT
Supervisory Special Agent
Drug Enforcement Administration

Sworn before me this 20th day of August, 2009.

HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

9